**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

|  |  |
|---|---|
| SKAGGS BROS & SONS FRAMS, LLC, et al., <br><br>     Plaintiffs, <br><br> v. <br><br> TYSON FOODS, INC., et al., <br><br>     Defendants. | Case No.:   1-24-cv-188 |

**MEMORANDUM OF LAW IN SUPPORT OF CAL-MAINE
FOODS, INC.'S  MOTION TO DISMISS PLAINTIFFS' PETITION**

#102889677v2

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

FACTUAL ALLEGATIONS ...................................................................................... 3

LAW AND ARGUMENT ........................................................................................... 4

    I.      COUNTS I AND II (FRAUD AND NEGLIGENT MISREPRESENTATION..... 5

    II.     COUNT IV (TORTIOUS INTEFERENCE) ........................................... 6

    III.    COUNT VI (CIVIL CONSPIRACY).................................................... 7

    IV.    COUNT VII (ANTITRUST) ................................................................ 8

        A.  PLAINITFFS CANNOT ESTABLISH ANTITRUST STANDING................ 8

        B.  PLAINITFFS FAILED TO ALLEGE A PLAUSIBLE ANTITRUST CONSPIRACY ................................................................................. 12

CONCLUSION........................................................................................................ 14

#102889677v2

## TABLE OF AUTHORITIES

**Cases**

*Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).................................... 5

*Addyston Pipe & Steel Co.*, 85 F. at 281-82 ....................................................... 2, 13, 14

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ............................................................ 4

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530-35 (1983).................................................................................. 8, 10

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007 ....................................................... 4

*Brian Clewer, Inc. v. Pan American World Airways, Inc.*, 674 F. Supp. 782 (C.D. Ca. 1986).... 11

*Business Elecs. Corp. v. Sharp Elecs. Corp.*, 455 U.S. 717, 723 (1988)..................................... 12

*Central National Bank v. Rainbolt*, 720 F.2d 1183 (10th Cir. 1983) .......................................... 11

*Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007) ..................... 12

*Dean v. Monteil*, 361 Mo. 1204, 239 S.W.2d 337 (Mo. 1951)....................................................... 14

*Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998) .......................... 12

*Dunafon v. Delaware McDonald's Corp.*, 691 F. Supp. 1232 (W.D. Mo. 1988) ........................ 13

*Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008)...................................... 7

*Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (5th Cir. 2013)............................. 5

*Hunter v. Page Cnty.*, 102 F.4th 853, 874 (8th Cir. 2024) ........................................................ 4, 5

*In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006).................................. 8

*John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977)................................ 11

*Kerrick v. Schoenberg*, 328 S.W.2d 595 (Mo. 1959) .................................................................. 14

*Legal Economic Evaluations v. Metropolitan Life Ins. Co.*, 39 F.3d 951 (9th Cir. 1994) .......... 11

*Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301, 1316 (8th Cir. 1980) .......... 8

*Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 448 (2008) .................................. 10

*Pandola v. Texaco, Inc.*, 1975 WL 873, 1975-1 Trade Cas. ¶60,232 (C.D. Cal. Jan. 16, 1975).. 11

*Reibert v. Atlantic Richfield Co.*, 471 F.2d 727 (10th Cir. 1973) ............................................... 11

*Rubloff Dev. Grp., Inc. v. SuperValue, Inc* , 863 F. Supp. 2d 732 (N.D. Ill. 2012)...................... 11

*Semo Servs. v. BNSF Ry. Co.*, 660 S.W.3d 430, 439 (Mo. Ct. App. 2022) ................................. 7

*Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 12 (1st Cir. 1999) ...................................................... 11

*Shepherd v. Spurgeon*, 365 Mo. 989, 291 S.W.2d 162 (Mo. 1956)............................................. 14

*Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011).................................................. 5

#102889677v2

*United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 281-82 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211 (1899) ................................................................................................................ 2

*United States v. Mercy Health Servs.*, 107 F.3d 632, 636 (8th Cir. 1997 ................................... 12

*Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30 (5th Cir. 1977) ............................... 11

*Velley Prods. Co. v. Landmark*, 128 F3d 398 (6th Cir. 1997) ..................................................... 11

**Statutes**

15 U.S.C. § 15(a) (1999 ............................................................................................................... 8

Mo. Rev. Stat. § 416.141 ......................................................................................................... 8, 14

**Rules**

Fed. R. Civ. P. 12(b)(6) ......................................................................................................... 1, 4, 14

Rule 9(b) ..................................................................................................................................... 2, 5

#102889677v2

Defendant Cal-Maine Foods, Inc. ("Cal-Maine") submits this memorandum in support of its Motion to Dismiss the Petition filed by Plaintiffs pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

As set forth below, Cal-Maine is bringing new economic life to the Dexter Missouri region by investing millions of dollars to repurpose a shuttered chicken meat processing complex (Dexter Complex) formerly owned by Tyson Foods. Inc. ("Tyson"). State tort laws do not, as Plaintiffs contend, impose an obligation on Cal-Maine to use the Dexter Complex as a chicken meat processing facility. Nor did state tort laws prohibit Cal-Maine from submitting an offer to purchase the Dexter Complex so some unidentified, phantom chicken meat processing company might have an opportunity to purchase the Dexter Complex instead of Cal-Maine.

In their Petition, Plaintiffs generally complain that they were misled to purchase equipment and invest in improvements in their farms based on representations "of what Plaintiffs should expect to earn and repeated promises that the Tyson Companies would continue to operate" the Dexter Complex. Petition ¶ 4. Plaintiffs do not identify a single promise, representation, or statement by Cal-Maine concerning their investments. To the contrary, the Petition makes clear that Cal-Maine is not engaged in the chicken meat processing business, that Cal-Maine has no need for broiler chickens, and that Cal-Maine at all times intended to repurpose the Dexter Complex to support its chicken egg production, distribution, and marketing business. As set forth in the Petition, the only dealings between Plaintiffs and Cal-Maine occurred years after Plaintiffs invested in their chicken farm businesses. Petition ¶¶ 52-56. Further, in the limited dealings that Cal-Maine had with Plaintiffs following its acquisition of the Dexter Complex, Plaintiffs could not possibly have been confused about Cal-Maine's intentions since, as Plaintiffs allege, Cal-Maine offered Plaintiffs grower contracts to provide services for Cal-Maine's chicken egg business. *Id.*

1

#102889677v2

These allegations fall far short of meeting the heightened pleading standard for fraud claims under Rule 9(b). They do not identify who at Cal-Maine made any misrepresentations, what Cal-Maine allegedly said to mislead Plaintiffs, when Cal-Maine made these alleged statements, or to whom Cal-Maine allegedly made the alleged statements. Instead, the entire Petition details a business dispute between Plaintiffs and Tyson based on alleged conduct occurring before Cal-Maine acquired the Dexter Complex. Plaintiffs cannot maintain a cause of action for fraud or negligent misrepresentation against Cal-Maine for conduct that Plaintiffs attribute to Tyson and Tyson employees. Other tort liability theories against Cal-Maine are equally flawed.

For example, the acquisition of the Dexter Complex by Cal-Maine to pursue its own business opportunities is exactly the type of transaction the antitrust laws are designed to encourage. While Plaintiffs complain about an ancillary restraint in the Property Use Agreement, this type of restraint is typical for commercial real estate transactions and protects the legitimate interest of a seller in not having the buyer use the property in competition with the seller. As explained by then future justice William Howard Taft, "covenants in partial restraint of trade are generally upheld as valid when they are agreements . . . by the buyer of property not to use the same in competition with the business retained by the seller." *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 281-82 (6th Cir. 1898), *aff'd as modified*, 175 U.S. 211 (1899). Cal-Maine and Tyson, as Plaintiffs alleged in the Petition, also have terminated the restrictive covenant. Any complaint Plaintiffs may have had about the restriction is now completely moot.

The bottom line is that Plaintiffs are upset that Tyson decided to close its facility and sell the Dexter Complex to a company not in the chicken meat processing business. Plaintiffs do not allege that Cal-Maine played any role in this decision. While Cal-Maine is sympathetic to Plaintiffs' plight, Cal-Maine has done nothing wrong and is not responsible for any losses Plaintiffs

2

may have suffered by reason of Tyson deciding to close its facility or sell that facility to Cal-Maine instead of a chicken meat processing company. To the contrary, the grower contracts, investment dollars, jobs, and other direct and indirect economic benefits that Cal-Maine is bringing to the region are substantial. No cause of action recognized in Missouri provides Plaintiffs with a claim against Cal-Maine and, thus, all claims against Cal-Maine should be summarily dismissed.

**FACTUAL ALLEGATIONS**

Plaintiffs allege that they invested millions of dollars "to build and maintain chicken houses (pursuant to the Tyson Companies' specifications), own and maintain the land where the chicken houses are located (pursuant to the Tyson Companies' specifications), purchase the equipment required to care or the chickens (pursuant to the Tyson Companies' specifications), and pay for the labor needed to successfully care or the chickens until the chickens were of egg production egg (pursuant to the Tyson Companies' specifications)" and that the Tyson Companies "processed the chickens at their chicken processing plant in Dexter, Missouri." Petition ¶¶ 3-4. Plaintiffs allege that they "put everything on the line or Tyson" and that Tyson announced its intention to close the plant on August 7, 2023 and then shuttered the plant in October 2023. Petition ¶¶ 14, 16.

Plaintiffs complain that Tyson sold the Dexter Complex to Cal-Maine and that this sale "decimated" their business because Cal-Maine was not in the chicken meat processing business and, therefore, did not need the services offered by Plaintiffs. Petition ¶¶ 26-28. However, the only interaction between Cal-Maine and Plaintiffs, according to the Petition, occurred when Cal-Maine offered grower contracts to Plaintiffs. Petition ¶¶ 52-56. Plaintiffs complain that the grower contracts made "no financial sense" for them because they would need to convert their farms to meet the requirements of Cal-Maine's chicken egg business instead of continuing to provide pullet broiler chicken services and the pricing offered by Cal-Maine would not cover their costs. *Id.*

3

Plaintiffs dedicate the vast majority of their Petition (¶¶79-128) to alleging that the contracts Plaintiffs had with Tyson imposed risk on Plaintiffs rather than Tyson, that Tyson convinced Plaintiffs to invest in their businesses, and that Tyson failed to timely disclose its intentions to shutter the Dexter Complex. None of these allegations have anything whatsoever to do with Cal-Maine which did nothing other than purchase the Dexter Complex from Tyson so it could use the facility for its own business. Cal-Maine had no contracts with Plaintiffs. Cal-Maine had no business dealings or pre-acquisition communications with Plaintiffs. All that Cal-Maine did was bring new life to the Dexter Complex and offer Plaintiffs an opportunity to provide services to Cal-Maine. Those services obviously were not the same as the services that Plaintiffs provided to Tyson; Cal-Maine operates in any entirely different market than Tyson. In short, Cal-Maine is an entirely innocent third party and should not be forced to defend itself against allegations that solely concern a commercial contract dispute between Plaintiffs and Tyson.

### LAW AND ARGUMENT

Plaintiffs seek damages against Cal-Maine for alleged fraudulent and negligent misrepresentation, tortious interference with business expectancy, civil conspiracy, and violations of Missouri state antitrust law.[1] *Id.* ¶¶ 129-56, 172-82, 189-204. In order to withstand dismissal under Fed. R. Civ. P. 12(b)(6), the Petition must state a claim that is "plausible on its face." *Hunter v. Page Cnty.*, 102 F.4th 853, 874 (8th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim has facial plausibility when a plaintiff pleads "factual content" that allows the court to draw a reasonable inference that the defendant is liable for the misconduct. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). A pleading that offers no more than "labels and

---

[1] Plaintiffs do not name Cal-Maine as a defendant with respect to their claims for unjust enrichment (Count III), promissory estoppel (Count V), or breach of contract (Count VIII).

#102889677v2

conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Id.* In short, Plaintiffs had an obligation to allege facts sufficient "to raise a right to relief above the speculative level." *Hunter*, 102 F.4th at 874. Plaintiffs fell far short of meeting this burden.

## I.    COUNT I AND II (Fraud and Negligent Misrepresentation)

Plaintiffs allege in Counts I and II that Cal-Maine harmed Plaintiffs by engaging in fraud and making negligent misrepresentations. The claims are frivolous, outrageous, and entirely without merit. To state a misrepresentation claim, Plaintiffs were required to meet the heightened pleading standard in Fed. R. Civ. P. 9(b). This standard required Plaintiffs to plead "such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Freitas v. Wells Fargo Home Mortg., Inc.*, 703 F.3d 436, 439 (5th Cir. 2013 (quoting *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001)) (quotation and citation omitted). "In other words, Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Id.* (quoting *Summerhill v. Terminix, Inc.*, 637 F.3d 877, 880 (8th Cir. 2011)). Plaintiffs have not pled any of the facts required to meet the heightened pleading standard in Rule 9(b).

Plaintiffs allege that they were misled into investing in their businesses so they could provide services to Tyson, but they do not allege that Cal-Maine had any dealings with Plaintiffs prior to its acquisition of the Dexter Complex and concede that they always knew that Cal-Maine was not in the chicken meat processing business. Cal-Maine, therefore, could not have made any representations that Plaintiffs relied on when they decided to contract with Tyson or invest in the construction of chicken houses, equipment, labor, and land required to provide services to Tyson. Instead, Plaintiffs seem to claim that Cal-Maine participated in a fraud by entering into a Property Use Agreement with Tyson in connection with its acquisition of the Dexter Complex. Plaintiffs

5

allege that this agreement prohibited Cal-Maine from using the land to compete with Tyson. This agreement did not change anything: (1) Plaintiffs had entered into contracts with Tyson and made the investments which Plaintiffs seek to recoup in this case years before Cal-Maine acquired the Dexter Complex; (2) Tyson also had shut down the Dexter Complex months before Cal-Maine acquired the Dexter Complex; and (3) Cal-Maine is not and has never been in the chicken meat processing business and, therefore, does not require pullet broiler chickens.

The elements of fraudulent misrepresentation are: "(1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent that it should be acted on by the person in the manner reasonably contemplated; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance on the representation being true; (8) the hearer's right to rely thereon; and (9) the hearer's consequent and proximately caused injury." *Id.* at 438-39. No facts have been alleged to support any of these elements. Nor have any facts been alleged to support a negligent misrepresentation claim. Plaintiffs have not alleged a misrepresentation by Cal-Maine, reliance on anything that Cal-Maine said or did, or that Cal-Maine said anything Plaintiffs could possibly have relied on to their detriment. Under these circumstances, the Court should dismiss Counts I and II of the Petition as to Cal-Maine.

## II.  COUNT IV (Tortious Interference)

Plaintiffs allege in Count IV that Cal-Maine interfered with the ability of Plaintiffs to do business with other meat processing companies and to contract with Cal-Maine. Petition ¶¶ 172-82. In order to prevail on an intentional interference claim, a plaintiff is required to allege facts to support each of the following cause of action elements: "1) an existing contract or a valid business expectancy; 2) defendant knew of the contract or business expectancy; 3) defendant intentionally interfered with the relationship or expectancy by creating a breach; 4) defendant lacked

6

justification and 5) the conduct damaged Plaintiff." *Semo Servs. v. BNSF Ry. Co.*, 660 S.W.3d 430, 439 (Mo. Ct. App. 2022). Plaintiffs have not alleged facts to support any of these elements. They allege a business expectancy with meat processing companies generally, but Plaintiffs do not name a single company with which they lost the opportunity to contract. They also provide no information to support the conclusion that such a company would have engaged Plaintiffs or under what terms, or allege facts to support the conclusion that Cal-Maine knew about this expectancy. Plaintiffs' allegation that Cal-Maine interfered with an expectancy among Plaintiffs to contract with Cal-Maine is even more far-fetched. Plaintiffs complain that the pricing offered by Cal-Maine in the grower contract was too low and included a release that extended to Tyson. These terms were commercially reasonable. Cal-Maine offered pricing that Cal-Maine believed were fair and sought a broad release to avoid getting dragged into frivolous lawsuits exactly like this one. However, even if the terms offered by Cal-Maine were commercially unreasonable, Cal-Maine cannot as a matter of law interfere with an alleged business expectancy between Plaintiffs and itself. Cal-Maine offered Plaintiffs a grower contract. Plaintiffs rejected the agreement. Free enterprise and capitalism simply do not support the contention that Cal-Maine had some kind of obligation to enter into an agreement on terms acceptable to Plaintiffs.

### III.   COUNT VI (Civil Conspiracy)

Plaintiffs allege that Cal-Maine engaged in a civil conspiracy to commit fraud by agreeing to tortiously interfere with their business expectancies and entering into the Property Use Agreement. Petition ¶¶ 189-94. This claim fails because the underlying wrongful acts alleged to be part of the civil conspiracy fail to state a viable cause of action. *Envirotech, Inc. v. Thomas*, 259 S.W.3d 577, 586 (Mo. Ct. App. 2008) (holding that "a conspiracy does not give rise to a civil action unless something is done pursuant to which, absent the conspiracy, would create a right of

7

action against one of the conspirators"). Namely, Plaintiffs have not alleged facts to support a cause of action against Cal-Maine for fraud, negligent misrepresentation, interference with business expectancy, or (as further discussed below) violation of Missouri state antitrust laws.

### IV.    COUNT VII (Antitrust)

Plaintiffs assert a damage claim for an alleged violation of "Missouri Antitrust Statutes" in Count VII of the Petition. Missouri state antitrust laws are "construed in harmony with ruling judicial interpretations of comparable federal antitrust statutes" Mo. Rev. Stat. § 416.141. Relying on Mo. Rev. Stat. § 416.141, the Eighth Circuit has instructed that that "the Missouri antitrust law . . . can be disposed of with the same rationale with which we have disposed of the Sherman Act claim." *Missouri v. National Organization for Women, Inc.*, 620 F.2d 1301, 1316 (8th Cir. 1980). A fundamental obligation of any private plaintiff asserting an antitrust claim is to establish antitrust standing. *In re Canadian Import Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) ("[A] private plaintiff must demonstrate that he has suffered an 'antitrust injury' as a result of the alleged conduct of the defendants, and that he has standing to pursue a claim under the federal antitrust laws.").

### A.    *Plaintiffs Cannot Establish Antitrust Standing*

Section 4 of the Clayton Act authorizes the award of damages under the antitrust laws to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor." 15 U.S.C. § 15(a) (1999). While this provision would be quite broad if read literally, the Supreme Court has determined that Congress did not intend § 4 to have such an expansive scope. *See Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530-35 (1983). Therefore, courts have constructed the concept of antitrust standing, under which they "evaluate the plaintiff's harm, the alleged wrongdoing by the defendants, and the relationship between them" to determine whether a plaintiff is a proper party

8

to bring an antitrust claim. *Id.* at 535. In this case, there is no plausible allegation or claim that Cal-Maine did anything wrong. Cal-Maine simply purchased a shuttered chicken meat processing plant for its own interests and invested millions of dollars in the plant and community to expand its business. Any injuries claimed by Plaintiffs were not caused by harm to competition. Even if Plaintiffs had alleged facts to support a causal link between their alleged injuries and an antitrust violation, the nature of the injuries claimed by Plaintiffs are too attenuated to support standing.

Count VII alleges that Defendants engaged in an unreasonable restraint of trade "for the purchase of pullet chicken farmer services in the Dexter, Missouri geographic area" and that but for the unreasonable restrain "another existing or newly created meat processing company would have paid Tyson" as much or more than Cal-Maine to purchase the Dexter Complex.[2] Petition ¶¶ 195-204. This liability theory fails as a matter of law because it wrongly assumes that the antitrust laws restricted the economic freedom of Cal-Maine to use the Dexter Complex however it liked after it purchased the facility. Cal-Maine is not in the meat processing business and had no obligation to enter a business line with which it has no experience to accommodate Plaintiffs.

Their antitrust theory also fails because the antitrust laws do not impose an obligation on Tyson to sell the Dexter Complex to "another existing or newly created meat processing company." Tyson had no obligation to sell the Dexter Complex to one of its competitors and did not cause harm to Plaintiffs by reason of an injury to competition by selling the Dexter Complex

---

[2] Cal-Maine disputes the factual allegations in the Petition. Plaintiffs, for example, significantly understates the purchase price for the Dexter Complex. Additionally, Plaintiffs intentionally omit information unhelpful to their story. *See* https://ded.mo.gov/press-room/cal-maine-foods-establish-egg-processing-facility-dexter-investing-13-million-and. In connection with its acquisition, the Missouri Department of Economic Development publicly announced that Cal-Maine was investing $13 million to repurpose the facility and creating 96 jobs. More recently, Cal-Maine publicly announced that it was expanding cage free production in Dexter, Missouri, with commitments that would result in approximately 1.2 million additional free range hens by the Fall of 2025, with plans to add more capacity.

9

#102889677v2

to Cal-Maine. To the contrary, buyers are free to choose from whom they will buy and sellers are free to choose to whom they will sell. *Pac. Bell Tel. Co. v. linkLine Communs., Inc.*, 555 U.S. 438, 448 (2008) (reiterating long standing precedent that the general rule under the antitrust laws is that businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing); *Assoc. Gen. Contractors of Cal., Inc.*, 459 U.S. at 538 (recognizing that protecting economic freedom is the "central interest" of the antitrust laws). In this case, Plaintiffs are asking the Court to upend fundamental principles of antitrust laws and property rights in the United States by holding that they guarantee economic security for their small group even if that means harming other farmers, workers, and free enterprise.

Nor did the Property Use Agreement transform the unilateral decision by Tyson to sell the Dexter Complex to a "non-competitor" into an antitrust conspiracy. Plaintiffs do not allege that Cal-Maine is engaged in the business of chicken meat processing in other locations or that it had plans to enter the chicken meat processing business. Plaintiffs do not even allege facts to support the proposition that anyone other than Cal-Maine had any interest in purchasing the facility. In the absence of these allegations, the Property Use Agreement did not change the status quo in a way that harmed Plaintiffs let alone competition. In the Plaintiffs' preferred world where no Property Use Agreement ever existed, Cal-Maine would still own the Dexter Complex and would still be using the facility to process chicken eggs instead of chicken meat. Consequently, Plaintiffs cannot point to the Property Use Agreement as the reason they lost the opportunity to sell their services.

Even if Plaintiffs had alleged a causal connection between the Property Use Agreement and their alleged injuries, the courts have long rejected antitrust claims based on fact patterns where the harm suffered by the plaintiff was incidental to the alleged antitrust violation. In *Associated General Contractors*, the U.S. Supreme Court explained that consumers and competitors in the

10

market where trade is allegedly restrained are presumptively the proper plaintiffs to allege antitrust injury. 459 U.S. at 539. Plaintiffs are neither consumers nor competitors. They filed suit in their capacity as former Tyson contractors or vendors and claim that they were harmed when Tyson sold the Dexter Complex to someone other than a chicken meat processing company. Nothing about these allegations implicate conspiratorial conduct by Cal-Maine. Further, when vendors, distributors, employees, and other third parties complain that an antitrust conspiracy had the effect of eliminating their jobs, the courts have consistently held that their injuries are too attenuated to the alleged antitrust violation to confer standing under Section 4 of the Clayton Act.[3]

Finally, Plaintiffs lack standing because their antitrust claim is moot. The Petition alleges that the Property Use Agreement has been rescinded. The Property Use Agreement, therefore,

---

[3] *See, e.g.*, *Serpa Corp. v. McWane, Inc.*, 199 F.3d 6, 12 (1st Cir. 1999) (holding that a plumbing supplies distributor who became superfluous as a result of manufacturer's merger lacked standing to challenge the merger);*Velley Prods. Co. v. Landmark*, 128 F3d 398 (6th Cir. 1997) (vendor lacked antitrust standing where harm flowed from termination of vendor agreement rather than alleged illegal agreements between franchisor and franchisees); *Legal Economic Evaluations v. Metropolitan Life Ins. Co.*, 39 F.3d 951 (9th Cir. 1994) (holding that a service provider to structured settlement consulting businesses lacked standing to challenge alleged conspiracy among insurance companies to drive structured consulting companies out of business); *Central National Bank v. Rainbolt*, 720 F.2d 1183 (10th Cir. 1983) (holding that a director of a corporation had no standing under the antitrust laws to challenge a takeover of the corporation); *Universal Brands, Inc. v. Philip Morris, Inc.*, 546 F.2d 30 (5th Cir. 1977) (post-merger supplier replaced an exclusive distributor whose subdistributor was denied standing to enjoin merger); *John Lenore & Co. v. Olympia Brewing Co.*, 550 F.2d 495 (9th Cir. 1977) (no standing for displaced dealer challenging manufacturer's merger); *Reibert v. Atlantic Richfield Co.*, 471 F.2d 727 (10th Cir. 1973) (holding that that an employee discharged because his job became redundant after a merger of two firms, had no standing to challenge the merger on antitrust grounds); *Rubloff Dev. Grp., Inc. v. SuperValue, Inc* , 863 F. Supp. 2d 732 (N.D. Ill. 2012) (shopping center developer lacked standing to challenge large grocery chain's manipulation and enforcement of exclusive shopping center leases; injury was in the grocery market, not development market); *Brian Clewer, Inc. v. Pan American World Airways, Inc.*, 674 F. Supp. 782 (C.D. Ca. 1986) (holding that a travel agent lacked standing where her injuries were derivative of an alleged conspiracy by defendants to divert business from a rival airline) *Pandola v. Texaco, Inc.*, 1975 WL 873, 1975-1 Trade Cas. ¶60,232 (C.D. Cal. Jan. 16, 1975) (dealer-lessee, who would have been displaced in any event after supplier-lessor decided to leave full-service business, not allowed to challenge defendant's allegedly illegal purchase of those properties).

11

cannot pose a continuing threat to competition. Without this threat, Plaintiffs have no standing to assert an antitrust claim. *United States v. Mercy Health Servs.*, 107 F.3d 632, 636 (8th Cir. 1997) (holding that antitrust challenge to abandoned merger was moot). Plaintiffs try to save their damages claim by pleading that they suffered their injuries before the recission. Petition ¶ 47. Specifically, they contend that they were injured when Tyson "gutted the plant of all equipment needed to process chickens, and Cal-Maine completely retrofitted the Dexter processing plant so that it can only [be] used to process table eggs". *Id.* However, this argument only exposes the flaw in Plaintiffs' legal theory. The Property Use Agreement did not injure Plaintiffs. What Plaintiffs are claiming caused them harm was the unilateral decision by Tyson to sell the Dexter Complex to someone other than a chicken meat processing company. The antitrust laws did not impose an obligation on Cal-Maine to use the Dexter Complex for a business preferred by Plaintiffs. The Property Use Agreement never posed a threat to competition. Count VII should be dismissed.

### B.        Plaintiffs Failed to Allege a Plausible Antitrust Conspiracy

In order to state an antitrust conspiracy claim, Plaintiffs were obligated to allege the existence of an agreement that unreasonably restrained trade. Meeting this burden required the Plaintiffs to allege facts to support a relevant product and geographic market and that the challenged restraint had "detrimental effects" on the competitiveness of that market.[4] *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 491 F.3d 380, 388 (8th Cir. 2007). Restrictive covenants

---

[4] Plaintiffs allege that the Property Use Agreement constituted a *per se* violation of the antitrust laws. Petition ¶ 201. This assertion is meritless. Plaintiffs admit that Cal-Maine does not compete with Tyson in any line of commerce. In the absence of this competition, Plaintiffs cannot establish that the alleged conspiracy falls within the limited class of conduct (i.e., price fixing, horizontal customer o geographic allocations, and horizontal group boycotts) subject to *per se* analysis. *See Business Elecs. Corp. v. Sharp Elecs. Corp.*, 455 U.S. 717, 723 (1988) ("[P]er se rules are appropriate only for conduct that is manifestly anticompetitive."); *Double D Spotting Serv. v. Supervalu, Inc.*, 136 F.3d 554, 558 (8th Cir. 1998) (Practices which have been held to be illegal per se include price-fixing, division of markets, group boycotts, and tying arrangements).

#102889677v2

ancillary to the sale and lease of real property have long been treated as lawful under the antitrust laws as long they are reasonable. *Dunafon v. Delaware McDonald's Corp.*, 691 F. Supp. 1232 (W.D. Mo. 1988) (holding that lease restriction did not pose threat to competition). As explained by then future justice William Howard Taft, "covenants in partial restraint of trade are generally upheld as valid when they are agreements  . . . by the buyer of property not to use the same in competition with the business retained by the seller." *Addyston Pipe & Steel Co.*, 85 F. at 281-82. The Petition does not allege the facts needed to support the conclusion that the restrictive covenant in this case would have a substantial adverse effect on competition and, therefore, fails as a matter of law.

Plaintiffs allege the wrong relevant market by asserting that the Court should analyze the Property Use Restriction as a restraint "on competition for the purchase of pullet chicken farmer services in the Dexter, Missouri geographic area." Petition ¶ 199. The restraint in question concerns the use of real property. The relevant product market is not competition for the purchase of pullet chicken farmer services but rather the market for sites available for chicken meat processing facility development. Plaintiffs do not allege that the challenged restraint concerned any property other than the Dexter Complex. Nothing in the restraint prevents a chicken meat processing company from purchasing other property in or around Dexter, Missouri for development. Defendants simply have no ability to exclude chicken meat processing companies from entering the market and Plaintiffs have not suggested in any way that Cal-Maine would have any interest in doing so since it does not conduct business or compete in that market.

The *Dunafon* decision is instructive. In that case, a restaurant owner that sought to lease space in a shopping center challenged a lease restriction which prohibited the shopping center from leasing space to the plaintiff. 691 F. Supp. at 1242. The court upheld the lease because the plaintiff

13

could not demonstrate that its exclusion from the shopping center prevented the restaurant from opening a restaurant at another site. *Id*. The same holds true here. Even if Plaintiffs could establish a causal connection between their alleged injuries and the Property Use Agreement, they cannot allege that the Property Use Agreement prevented chicken meat processing companies from developing other sites in and around Dexter, Missouri. The antitrust claim, therefore, fails.

Plaintiffs also cannot revive their claim by pointing to decisions in which Missouri state courts have held that real property restrictive covenants are disfavored. *See Dean v. Monteil*, 361 Mo. 1204, 239 S.W.2d 337 (Mo. 1951); *Shepherd v. Spurgeon*, 365 Mo. 989, 291 S.W.2d 162 (Mo. 1956); *Kerrick v. Schoenberg*, 328 S.W.2d 595 (Mo. 1959). Each of these decisions involved broad use restrictions for indefinite periods of time. By contrast, Plaintiffs allege that the restriction at issue was for a limited duration and narrowly tailored. This difference in facts is decisive. Moreover, these state court cases were decided before the Missouri state legislature adopted Mo. Rev. Stat. § 416.141 in 1974. With the adoption of Mo. Rev. Stat. § 416.141, antitrust conspiracy challenges against ancillary restraints must be consistent with the admonition in *Addyston* that "partial restraint of trade are generally upheld as valid when they are agreements . . . by the buyer of property not to use the same in competition with the business retained by the seller." *Addyston Pipe & Steel Co.*, 85 F. at 281.

## CONCLUSION

For the reasons set forth above, Cal-Maine respectfully requests that the Court dismiss the claims against Cal-Maine in Counts  I, II, IV, VI, and VII of the Petition pursuant to Fed. R. Civ. P. 12(b)(6).

14

Date: October 18, 2024                    Respectfully submitted,


By: */s/ Ross D. McFerron*  Ross D.
McFerron, (Bar No. #60046)
OSBURN, HINE & YATES, L.L.C.
3071 Lexington Avenue
Cape Girardeau, MO 637701
Telephone: (573) 651-9000
Facsimile: (573) 651-9090
rmcferron@ohylaw.com

*Counsel for Defendant Cal-Maine*
*Foods, Inc.*


**CERTIFICATE OF SERVICE**

I hereby certify that on October 18, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the electronic filing system. A true and correct copy of the foregoing was served via email to Plaintiffs' counsel.

By:      */s/ Ross D. McFerron*
              Ross D. McFerron

15

#102889677v2