**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION**

| | |
|---|---|
| SKAGGS BROS & SONS FARMS, LLC, et al. <br><br> Plaintiffs, <br><br> v. <br><br> TYSON FOODS, INC., et al <br><br> Defendants. | No.:  1:24-cv-00189-SEP |

**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO
<u>ALL DEFENDANTS' MOTIONS TO DISMISS</u>**

Plaintiffs Skaggs Bros & Sons Farms, LLC, Elijah (Eli) Skaggs, and Melissa Skaggs ("**Plaintiffs**" or the "**Skaggs Parties**") file this Combined Memorandum in Opposition to the following motions to dismiss, and memoranda in support:

(1) Memorandum of Law in Support of Cal-Maine Foods, Inc's Motion to Dismiss Plaintiffs' Petition (Doc. 19) ("**Cal-Maine Motion**");

(2) Tyson's Motion to Dismiss Plaintiffs' Petition and Memorandum of Law in Support (Doc. 21) ("**Tyson Motion**"); and

(3) Mark Avery and Michael Fuller's Motion to Dismiss Plaintiffs' Petition and Memorandum of Law in Support (Doc. 22) ("**Avery & Fuller Motion**").

# TABLE OF CONTENTS

I. Introduction ............................................................................................................. 1

II. Legal Standards ...................................................................................................... 2

III. Factual Background ............................................................................................... 3

IV. Argument ................................................................................................................ 5

  A. Plaintiffs properly pleaded fraudulent and negligent misrepresentation claims .................. 5

  B. Plaintiffs' unjust enrichment and promissory estoppel claims are proper .......................... 10

  C. Plaintiffs properly pleaded their tortious interference claim ................................................. 13

  D. Plaintiffs properly pleaded Missouri Antitrust Law claims.................................................. 16

    1. Defendants overlook Missouri law that defeats their arguments...................................... 16

    2. Plaintiffs sufficiently allege they have antitrust standing................................................ 18

    3. Plaintiffs alleged a plausible antitrust conspiracy ........................................................... 19

    4. Plaintiffs properly allege antitrust claims against Tyson .................................................. 22

    5. Plaintiffs sufficiently allege Avery and Fuller's participation ......................................... 23

  E. Plaintiffs properly pleaded breach of contract claims against Tyson.................................... 24

  F. Plaintiffs' civil conspiracy claim is proper......................................................................... 25

V. Conclusion ............................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*A & L Underground, Inc. v. Leigh Constr., Inc.*,
  162 S.W.3d 509 (Mo. App. 2005) ............................................................................................11

*AIDS Healthcare Foundation v. Express Scripts, Inc.*,
  658 F. Supp. 3d 693 (E.D. Mo. 2023) .................................................................................... 25

*Andes v. Albano*,
  853 S.W.2d 936 (Mo. banc 1996) ............................................................................................ 8

*Ash v. Anderson Merchs., LLC*,
  799 F.3d 957 (8th Cir. 2015) ................................................................................................... 3

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ............................................................................................................ 2, 3

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
  472 U.S. 585 (1985) ................................................................................................................22

*Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*,
  332 S.W.3d 184 (Mo. App. 2010) ........................................................................................... 6

*Bayne v. Jenkins*,
  593 S.W.2d 519 (Mo. banc 1980) ............................................................................................ 8

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................................................ 2, 3

*Bell v. Shelter Gen. Ins. Co.*,
  No. SC 100461, 2024 WL 4828110 (Mo. Nov. 19, 2024) ..................................................... 25

*Bergjans Farm Dairy Co. v. Sanitary Milk Producers*,
  241 F. Supp. 476 (E.D. Mo. 1965) ........................................................................................ 23

*Braden v. Wal-Mart Stores, Inc.*,
  588 F.3d 585 (8th Cir. 2009) ................................................................................................... 3

*Browning v. Anheuser-Busch, LLC*,
  539 F. Supp. 3d 965 (W.D. Mo. 2021) .................................................................................. 12

*Chase v. First Fed. Bank of Kansas City*,
  No. 4:17-CV-0094-DGK, 2018 WL 1278203 (W.D. Mo. Mar. 12, 2018) .............................. 12

*Chesus v. Watts*,
   967 S.W.2d 97 (Mo. App. 1998) ........................................................................................11

*CIBC Bank USA v. Williams*,
   669 S.W.3d 298 (Mo. App. 2023) ..................................................................................... 10

*Compare State ex rel. Doe Run Res. Corp. v. Neill*,
   128 S.W.3d 502 (Mo. banc 2004) ..................................................................................... 15

*Cromeans v. Morgan Keegan & Co.*,
   No. 2:12-CV-04269-NKL, 2013 WL 12129609 (W.D. Mo. Nov. 5, 2013) ............................ 12

*Darius Cole Transp. Co. v. White Star Line*,
   186 F. 63 (6th Cir. 1911) .................................................................................................. 20

*Data Mfg., Inc. v. United Parcel Serv., Inc.*,
   557 F.3d 849 (8th Cir. 2009) ............................................................................................... 3

*Dawes v. Elliston*,
   369 S.W.2d 285 (Mo. App. 1963) ........................................................................................ 9

*Dean v. Monteil*,
   239 S.W.2d 337 (Mo. 1951) .............................................................................................. 21

*Dunafon v. Delaware McDonald's Corp.*,
   691 F. Supp. 1232 (W.D. Mo. 1988) ................................................................................. 21

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
   637 F.3d 435 (4th Cir. 2011) ............................................................................................. 20

*Foam Supplies, Inc. v. The Dow Chem. Co.*,
   No. 4:05 CV 1772 CDP, 2006 WL 2225392 (E.D. Mo. Aug. 2, 2006)................................... 20

*Gen. Indus. Corp. v. Hartz Mountain Corp.*,
   810 F.2d 795 (8th Cir. 1987) ............................................................................................. 18

*Graham v. Hubbs Mach. & Mfg., Inc.*,
   92 F. Supp. 3d 935 (E.D. Mo. 2015) .................................................................................. 15

*Hall v. Am. Oil Co.*,
   504 S.W.2d 313 (Mo. App. 1973) ...................................................................................... 17

*Hess v. Chase Manhattan Bank, USA, N.A.*,
   220 S.W.3d 758 (Mo. banc 2007) ........................................................................................ 8

*Hinkle, et al v. Tyson, et. al.*,
   Case No. 24NM-CV000313 (Circuit Court of New Madrid County, Mo.) ...................... passim

*Howard v. Turnbull*,
   258 S.W.3d 73 (Mo. App. 2008) ............................................................. 10

*Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*,
   797 F.3d 538 (8th Cir. 2015) ................................................................. 23

*Kerrick v. Schoenberg*,
   328 S.W.2d 595 (Mo. 1959) ................................................................... 21

*LifeScience Techs., LLC v. Mercy Health*,
   632 F. Supp. 3d 949 (E.D. Mo. 2022) ................................................ 2, 3

*Lowe v. Hill*,
   430 S.W.3d 346 (Mo. App. 2014) ........................................................... 11

*Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*,
   223 F.3d 873 (8th Cir. 2000) ................................................................... 7

*McCoy v. Walmart, Inc.*,
   No. 18-03256-CV-S-BP, 2019 WL 13207573 (W.D. Mo. Aug. 12, 2019) ................ 7

*Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*,
   406 F.3d 1052 (8th Cir. 2005) ................................................................. 9

*Murray-Kaplan v. NEC Ins., Inc.*,
   617 S.W.3d 485 (Mo. App. 2021) ........................................................... 11

*Penn v. Iowa State Bd. of Regents*,
   999 F.2d 305 (8th Cir. 1993) ................................................................... 3

*R.W. Murray Co. v. Shatterproof Glass Corp.*,
   697 F.2d 818 (8th Cir. 1983) ................................................................... 7

*Reisenbichler v. Marquette Cement Co.*,
   108 S.W.2d 343 (Mo. 1937) ................................................................... 18

*Ringstreet Northcrest, Inc. v. Bisanz*,
   890 S.W.2d 713 (Mo. App. 1995) ............................................................. 8

*Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*,
   772 F.2d 214 (6th Cir. 1985) ................................................................. 17

*S.D. Collectibles, Inc. v. Plough, Inc.*,
   952 F.2d 211 (8th Cir. 1991) ................................................................. 18

*Shawnee Compress Co. v. Anderson*,
   209 U.S. 423 (1908) ............................................................................. 20

*Shepherd v. Spurgeon,*
  291 S.W.2d 162 (Mo. 1956) ............................................................. 21

*Steelhead Townhomes, L.L.C. v. Clearwater 2008 Note Program, LLC,*
  537 S.W.3d 855 (Mo. App. 2017) ................................................... 10

*Strand v. Diversified Collection Serv., Inc.,*
  380 F.3d 316 (8th Cir. 2004) ............................................................ 3

*Trimble v. Pracna,* 167 S.W.3d 706 (Mo. banc 2005) ................................. 7

*United States v. Addyston Pipe & Steel Co.,*
  85 F. 271 (6th Cir. 1898) ................................................... 19, 20, 23

*Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP,*
  540 U.S. 398 (2004) ....................................................................... 22

*Webb v. Dr Pepper Snapple Group, Inc.,*
  4:17–00624–CV–RK, 2018 WL 1955422 (W.D. Mo. Apr. 25, 2018) ................... 12

**Statutes**

15 U.S.C. § 2 ................................................................................ 22

15 U.S.C. § 14 .............................................................................. 17

R.S. Mo. § 416.021(1) ..................................................................... 17

R.S. Mo. § 416.031 ......................................................................... 17

**Other Authorities**

Robert H. Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division,*
  74 YALE L.J. 775, 831 (1965) ......................................................... 20

## I.   __Introduction__

Plaintiffs — Skaggs Bros & Sons Farms, LLC, Elijah (Eli) Skaggs, and Melissa Skaggs, (the "**Skaggs Parties**") — are the owners and operators of chicken barns that, until Tyson shuttered its Dexter, Missouri Complex in late 2023, provided chicken grow out services to Tyson Foods, Inc., Tyson Sales and Distribution, Inc., and Tyson Chicken, Inc. (collectively, "**Tyson**"). On September 9, 2024, Plaintiffs filed a Petition in the Circuit Court of Stoddard County, Missouri alleging eight claims against Tyson and against Cal-Maine Foods, Inc. ("**Cal-Maine**"), Mark Avery ("**Avery**") and Michael Fuller ("**Fuller**").[1] *See* Doc. 6 (Plaintiffs' Petition, hereafter "**Pet.**").

The Skaggs Parties are not the first chicken farmers to sue Tyson, Avery, and Fuller in Missouri state court asserting claims related to the closure of the Dexter Complex. An earlier lawsuit — *Hinkle, et al. v. Tyson, et al.*, Case No. 24NM-CV00313 (Circuit Court of New Madrid County, Mo.) (the "***Hinkle* case**") — was filed in December 2023 and also named Avery and Fuller as defendants. The allegations and claims in the *Hinkle* case against Tyson, Avery, and Fuller are substantially similar to those asserted by the Skaggs Parties. *Compare* Doc. 6 (Pet.) *with* Motion to Remand **Ex. A** (*Hinkle* redacted Amended Petition, filed 6/3/2024) (Doc. 36-1).[2] Each Petition includes similar core allegations and has a common set of claims.[3] This Petition contains more detailed allegations, developed after discovery in *Hinkle* and targeted at Tyson's anticompetitive sale of the Dexter Complex to Cal-Maine and at Avery and Fuller's key roles in the conspiracy.

---

[1] Defendants improperly removed this case, and Plaintiffs filed a motion to remand. Doc. 36.

[2]  References to **Exhibits A** through **K** refer to the Exhibits already attached to Plaintiffs' Motion to Remand (Doc. 36), and Plaintiffs do not re-attach them here. Also, all page number citations in this Opposition refer to the pagination automatically generated by CM/ECF.

[3]  The common claims are: fraudulent misrepresentation; negligent misrepresentation; unjust enrichment; tortious interference with contract and business expectancy; promissory estoppel; conspiracy; and breach of contract. The Skaggs Parties also have a Missouri Antitrust Law claim.

Tyson, Avery, and Fuller filed *two* motions to dismiss the claims against them in *Hinkle*, and the Circuit Court (the Honorable Joshua D. Underwood) denied both motions, so the *Hinkle* Plaintiffs are currently pursuing their claims against Tyson, Avery, and Fuller. *See* **Ex. B** (*Hinkle* Order dated 5/2/24, Doc. 36-2); **Ex. C** (*Hinkle* Docket Text Order dated 7/9/24, Doc. 36-3).[4] In their motions to dismiss the *Hinkle* case, Tyson, Avery, and Fuller frequently cited **the same cases** they again rely on in their Motions to Dismiss (and in their Notice of Removal), but they fail to advise this Court that their arguments have been ***rejected twice*** by Judge Underwood in *Hinkle*.

Defendants' omission of Judge Underwood's rulings on substantially similar allegations is inexcusable. Defendants know full well that a Missouri state court judge has **twice** rejected Tyson, Avery, and Fuller's arguments — raised under Missouri's more stringent "fact pleading" standards — that substantially similar allegations by other chicken farmers fail to state viable claims. Yet they re-assert these already-rejected arguments here without disclosing their losses to this Court. Their arguments ignore key allegations and badly misstate both Missouri and federal law. Defendants' motions should be denied, as they were twice by Judge Underwood in *Hinkle*.

## II.    Legal Standards

"Under Federal Rule of Civil Procedure Rule 12(b)(6), courts shall not dismiss any complaint that states a facially plausible claim to relief." *LifeScience Techs., LLC v. Mercy Health*, 632 F. Supp. 3d 949, 953 (E.D. Mo. 2022) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

[4] The two rounds of motion to dismiss briefing in *Hinkle* were attached as Exhibits D through K to Plaintiffs' Motion to Remand: **Ex. D** (Tyson 2/5/24 MTD); **Ex. E** (Avery 2/5/24 MTD); **Ex. F** (Fuller 2/5/24 MTD); **Ex. G** (Plaintiffs' Combined Opp'n, 4/23/24); **Ex. H** (Tyson 6/13/24 MTD); **Ex. I** (Avery 6/13/24 MTD); **Ex. J** (Fuller 6/13/24 MTD); **Ex. K** (Plaintiffs' Combined Opp'n, 6/26/24); *see* Docs. 36-4 through 36-11.

defendant is liable for the misconduct alleged." *Ash v. Anderson Merchs., LLC*, 799 F.3d 957, 960 (8th Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678).

"When considering a motion to dismiss for failure to state a claim, a court must accept the factual allegations in the complaint as true, and may not consider evidence outside the complaint." *Penn v. Iowa State Bd. of Regents*, 999 F.2d 305, 307 (8th Cir. 1993). Allegations are to be "construed in favor of the plaintiff," *Data Mfg., Inc. v. United Parcel Serv., Inc.*, 557 F.3d 849, 851 (8th Cir. 2009), and courts "must accept the facts alleged as true, even if 'doubtful,'" *LifeScience Techs.*, 632 F.Supp.3d at 953 (quoting *Twombly*, 550 U.S. at 555). "'[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and 'that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*).[5] "Finally, the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

## III.    Factual Background

Plaintiffs only briefly overview the extensive factual allegations in their Petition, which spans 210 paragraphs and 46 pages. Additional details are also mentioned below. From January 1998 until late 2023, Tyson operated a vertically integrated chicken production system in Stoddard County, Missouri at the "Dexter Complex." E.g., Pet. ¶¶ 1–15, 79–103. Under its system, Tyson owned all chickens throughout the hatching, growing, and slaughter process. *Id.* Although Tyson owned all chickens, Tyson contracted with farmers to care for the chickens through every step. These farmers, in turn, and based on Tyson's representations, were induced to invest millions of

---

[5] *See Strand v. Diversified Collection Serv., Inc.*, 380 F.3d 316, 317 (8th Cir. 2004) (motions to dismiss should be granted "only in the unusual case in which a plaintiff includes allegations that show, on the face of the complaint, that there is some insuperable bar to relief") (internal quotations and citations omitted).

dollars in capital to build and maintain chicken houses (per Tyson's exclusive specifications), provide the equipment required to care for the chickens (per Tyson's exclusive specifications), and pay for the labor needed to care for the chickens (per Tyson's exclusive specifications). *Id.* Tyson then processed the chickens at the Dexter Complex.

On August 7, 2023, Tyson announced all operations at the Dexter Complex would cease in October 2023. In the fallout of their announcement, Tyson promised Missouri's elected leaders, including Senator Josh Hawley, that it would follow Missouri law and consider selling the Dexter Complex to a competitor. *Id.* ¶¶ 16–29. Tyson promptly breached their promises to Missouri's elected leaders by engaging in an anticompetitive scheme to limit the use of the Dexter Complex for 25 years. *Id.* Even as Tyson made its public promises, their allegedly "confidential" internal documents showed directly contrary plans, with CEO Donnie King stating "it was the policy of Tyson Foods not to sell [] facilities to competitors." *Id.* ¶¶ 24–25.

The petition alleges detailed facts showing Tyson achieved this anticompetitive goal when it sold the Dexter Complex to Cal-Maine (which processes table eggs, not fertile eggs) on the cheap, gutted the plant of equipment for processing chickens, and agreed with Cal-Maine to restrict the property's use for the next 25 years. *Id.* ¶¶ 26–51. Not only did Defendants engage in this blatantly anticompetitive deal, but they obscured it from the public by agreeing not to file the restrictive covenant with the Stoddard County Recorder of Deeds. *Id.* ¶¶ 29–36.

The Petition provides information about each plaintiff and defendant, *id.* ¶¶ 60–74, including noting that Defendant Mark Avery was employed by Tyson in a supervisory and/or management role as the Complex Manager of the Dexter Complex, is tasked with enforcing the unlawful restrictive covenant, and that the Sale Agreement defined "Seller's Knowledge" as Mark Avery's knowledge. *Id*. ¶¶ 34–44. Defendant Michael Fuller likewise had a supervisory and/or

management role at Tyson, specifically as manager of the Egg Production/Layer House Growing operation. *Id.* ¶ 69. Plaintiffs allege detailed facts about their specific dealings with Defendants, including the representations, promises, and projections relating to demands that Plaintiffs make significant upgrades and investments on their farms, and incur debt to do so, with the debt repayment projected to occur over nearly 15 years of dealing with Tyson. *Id.* ¶¶ 97–128. Plaintiffs also allege facts about Tyson's private, internal decision in or around November 2021 (if not earlier) to shutter the Dexter Complex, along with the many actions Tyson, Avery, and Fuller took publicly — directed both at Plaintiffs and at neighboring farmers — that assured them and the Dexter community that Tyson would operate there for years to come. *E.g. id.* ¶¶ 16–51, 104–128.

But Defendants had been lying to Plaintiffs and concealing their true plans, all while Plaintiffs incurred crushing debt loads at the repeated demands of Tyson, Avery, and Fuller. And Plaintiffs are now unable to realize business expectancies due to all Defendants' wrongful tortious interference and violation of the Missouri Antitrust Law.

## IV.   Argument

### A.  Plaintiffs properly pleaded fraudulent and negligent misrepresentation claims

Tyson, Avery, and Fuller raise five arguments for dismissing Plaintiffs' fraudulent and negligent misrepresentation claims. Many arguments are recycled from their twice-denied motions to dismiss in *Hinkle*, and their contentions remain wrong and do not support dismissal here either. Cal-Maine also seeks dismissal of these claims, which Plaintiffs did not intend to assert against it.

**First**, Defendants assert these claims "are barred by the economic loss doctrine." *E.g.* Tyson Motion (Doc. 21) at 10; Avery & Fuller Motion (Doc. 22) at 13–14. Judge Underwood already considered and rejected these same arguments based on the same cases. *See* Doc. 36-2 & 36-3. In their prior motions, Tyson, Avery, and Fuller recognized that a guiding Missouri precedent

was *Autry Morlan Chevrolet Cadillac, Inc. v. RJF Agencies, Inc.*, 332 S.W.3d 184 (Mo. App. 2010). *E.g.* Docs. 36-4 at 14–15, Doc. 36-5 at 5–6 (citing *Autry Morlan*). But in *Autry Morlan*, the Missouri Court of Appeals ***reversed*** a trial court's order granting summary judgment based on the economic loss doctrine. The Court of Appeals explained that the plaintiff had alleged "a special relationship" existed and that a separate "duty arose from" the dealings between the parties. *Id.* at 194. Those were facts that, "[i]f proven," meant that the plaintiff's "claim against [Defendants] would not be barred by the economic loss doctrine and [Defendants] would not be entitled to summary judgment as a matter of law." *Id.* Defendants now choose to ignore this case (like they ignore Judge Underwood's Orders) because they have no response to it.

The same kind of facts found important in *Autry Morlan* are alleged and will be proven here. Plaintiffs specifically allege that Defendants carried out a scheme to burden Plaintiffs with debt and acquire enormous leverage and influence over them, holding Plaintiffs hostage while they repeatedly demanded ever more expensive investments to be financed through debt that, allegedly, would be paid off over 15 years of continued dealing with Tyson. In these circumstances, a duty arose for Tyson, Avery, and Fuller to speak truthfully to Plaintiffs, especially after Defendants determined they would shutter the Dexter Complex. Instead, they continued to mislead and threaten Plaintiffs into incurring more debt. Defendants may contest these allegations, but (as in *Autry Morlan*) those are arguments that must be raised after discovery.

In addition, Missouri law simply does not support applying the economic loss doctrine to the specific kind of misrepresentation and concealment claims alleged here. As the Missouri Supreme Court has explained, a "party who fraudulently induces another to contract and then also refuses to perform the contract commits two separate wrongs, so that the same transaction gives rise to distinct claims that may be pursued to satisfaction consecutively." *Trimble v. Pracna*, 167

S.W.3d 706, 711 (Mo. banc 2005). Indeed, "'[c]ourts generally agree that fraud in the inducement, necessarily prior to the contract, is independent of the contract and therefore not barred by the economic loss doctrine.'" *McCoy v. Walmart, Inc.*, No. 18-03256-CV-S-BP, 2019 WL 13207573, at *4–5 (W.D. Mo. Aug. 12, 2019) (quoting *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 223 F.3d 873, 885 (8th Cir. 2000)); s*ee also R.W. Murray Co. v. Shatterproof Glass Corp.*, 697 F.2d 818, 831 (8th Cir. 1983) ("Generally, claims based on misrepresentation or fraud are distinct from and contain different elements than claims grounded on breach of warranty or contract."). Plaintiffs here claim they were misled by Tyson, Avery, and Fuller in entering into their contracts with Tyson and in acceding to their demands to upgrade their facilities and incur more debt. Those are precisely the kinds of circumstances that place their claims here outside the economic loss doctrine, as shown by cases like *Trimble*, *McCoy*, *Marvin Lumber*, and *R.W. Murray*.[6]

**Second**, Tyson, Avery, and Fuller argue the Petition lacks sufficient details about the misrepresentations at issue. *E.g.* Tyson Motion (Doc. 21) at 10; Doc. 22 (Avery & Fuller Motion) at 9–11. These arguments largely recycle contentions raised twice and rejected twice in *Hinkle*, and their third effort should fare no better. As twice found by Judge Underwood considering very similar allegations, Plaintiffs provided a wealth of details about Tyson, Avery, and Fuller's demands and promises, all of which were based on fundamental fact of Tyson doing business with Plaintiffs for many more years during which their sizable debts would be paid off. And, after Defendants decided in or around November 2021 (if not earlier) to shutter the Dexter Complex, every one of these statements, promises, and interactions with Plaintiffs were false and

---

[6] Again, though Plaintiffs cited these cases in *Hinkle*, Defendants do not try to distinguish them. Nor are Defendants correct that Plaintiffs "expressly seek" identical damages on their contract and misrepresentation claims. Doc. 22 at 14. As held by the cases that Defendants ignore, Plaintiffs are entitled to pursue both these "distinct claims" with their distinct damages. *E.g. Trimble*, 167 S.W.3d at 711.

fundamentally misleading, giving rise to a duty to speak. *E.g.* Pet. ¶¶ 87–127. Plaintiffs also pleaded detailed allegations about how Defendants concealed their scheme and continued to mislead the Dexter Community (including their knowledge that their statements to neighboring farmers would reach Plaintiffs) by writing to "other growers in the Dexter Complex promising contracts for construction or improvements of growing houses sent within weeks of the August 7, 2023 announcement" that Tyson was abandoning the Dexter community. Pet. ¶¶ 124–125.

Furthermore, Plaintiffs' claims are asserted in part based on a theory of fraudulent non-disclosure of knowledge Defendants possessed about the closure of the Dexter Complex and concealment of a truth that they had a duty to disclose. *E.g. id.* ¶¶ 124–143. In Missouri, fraudulent non-disclosure is not a separate tort. Instead, a party's silence in the face of a legal duty to speak replaces the first element of Fraudulent Misrepresentation: the existence of a representation. *Andes v. Albano*, 853 S.W.2d 936, 943 (Mo. banc 1996); *Hess v. Chase Manhattan Bank, USA, N.A.*, 220 S.W.3d 758, 765 (Mo. banc 2007). In nondisclosure cases, a party's silence amounts to a representation where the law imposes a duty to speak. *Andes*, 853 S.W.2d at 943. "Whether or not a duty to disclose exists . . . must be determined on the facts of the particular case." *Ringstreet Northcrest, Inc. v. Bisanz*, 890 S.W.2d 713, 720 (Mo. App. 1995).

A duty to speak arises where one party has superior knowledge or information that is not reasonably available to the other. *Andes*, 853 S.W.2d at 943. "Silence can be an act of fraud where matters are not what they appear to be and the true state of affairs is not discoverable by ordinary diligence." *Bayne v. Jenkins*, 593 S.W.2d 519, 529 (Mo. banc 1980). Tyson, Avery, and Fuller had superior knowledge of Tyson's secret intentions to close the Dexter Complex, and that information was not reasonably available to Plaintiffs.

**Third**, Defendants argue any pleaded misrepresentations "do not 'relate to a past or

8

existing fact'" and thus are not actionable. *E.g.* Doc. 22 (Avery & Fuller Motion) at 11–12. Defendants do not accurately describe Plaintiffs' allegations, which have twice passed muster.

Plaintiffs allege that Tyson, Avery, and Fuller knew of the planned closure and committed fraudulent non-disclosure by concealing this material fact from Plaintiffs as they induced Plaintiffs to continue borrowing large sums of capital. Further, Plaintiffs allege that Tyson, Avery, and Fuller **knew** of the closure and still made these representations and did not correct them later. *E.g.* Pet. ¶¶ 102–103, 104–119, 122–126, 130–132. There are no "predictions as to future actions" of Tyson when Defendants Avery and Fuller **knew** the Dexter Complex would close, as alleged by Plaintiffs, and/or recklessly made the alleged representations and failed to correct them later. *Id.*

Defendants' argument also ignores that (as Plaintiffs successfully argued in *Hinkle*) Missouri law — and specifically the relevant Missouri Approved jury instruction (MAI 23.05) — expressly allows and provides jury instruction language for claims of fraudulent misrepresentation about a future event, like the projections alleged here, when the defendant knew the representation was false when made.[7] Plaintiffs' allegations state viable claims under Missouri law.

**Fourth**, Avery and Fuller argue they cannot be liable for misrepresentations that "relate to *Tyson's* purported intent to continue contracting with Plaintiffs." Doc. 22 at 12 (emphasis in original) (citing *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005)). That argument ignores their duty to speak and correct their own prior statements, as argued above. And Defendants overstate and mischaracterize *Moses.com*, which in the cited section found a lack of any reliance by the plaintiff given that the alleged representation concerned

---

[7] *See Dawes v. Elliston*, 369 S.W.2d 285, 288–89 (Mo. App. 1963) (describing an "exception" to the general requirement that a fraudulent statement "must relate to an existing fact" for "[f]alse representations and promises as to what will result in the future, when made by one professing to have superior knowledge based on past experience of himself or others [which] are, in effect, false representations of existing conditions and support allegations of fraud").

a "third party" and appeared in a "press release" that the plaintiff "could not have relied on" in hiring the defendant "because the press release was issued months after [defendant] and [plaintiff] signed had signed the letter of intent." 406 F.3d at 1065. Those facts have no relevance here.

### B. Plaintiffs' unjust enrichment and promissory estoppel claims are proper

As they did in *Hinkle* and in their Notice of Removal, Tyson, Avery, and Fuller misstate Missouri law in arguing that Plaintiffs cannot plead and pursue claims for unjust enrichment and promissory estoppel because the "express contracts between Skaggs Bros and Tyson preclude" such claims.[8] That is wrong: "it is well-established that a party may plead claims both for breach of contract, and on equitable theories which are only available in the ***absence*** of a contract." *Steelhead Townhomes, L.L.C. v. Clearwater 2008 Note Program, LLC*, 537 S.W.3d 855, 863 (Mo. App. 2017) (emphasis in original); *Howard v. Turnbull*, 258 S.W.3d 73, 76 (Mo. App. 2008) (reversing grant of motion to dismiss because claims for unjust enrichment and breach of contract could be pleaded alternatively, and the "allegation that the [defendants] breached an express contract is an alternative pleading to his other causes of action, which is allowable in Missouri").

Plaintiffs are clearly entitled to plead alternative theories of recovery under Missouri law. *See CIBC Bank USA v. Williams*, 669 S.W.3d 298, 311–12 (Mo. App. 2023). In that case, the Missouri Court of Appeals reversed the dismissal of claims, including breach of contract and unjust enrichment, and the Court of Appeals specifically relied on the plaintiff's allegations that "it would be unjust for Williams and Landzaat to retain the benefits because they were gained as a result of Williams' and Landzaat's wrongful actions, namely Williams' violations of the Williams Agreement and both individuals' breaches of their duties owed to CIBC." *Id.*; *see also Murray-*

---

[8] *E.g.* Tyson Motion (Doc. 21) at 14, *id.* at 10–11; *see also* Motion to Remand (Doc. 36) at 17–18 (noting same arguments were twice raised and rejected by Judge Underwood in *Hinkle*).

*Kaplan v. NEC Ins., Inc.*, 617 S.W.3d 485, 497 (Mo. App. 2021) ("[A] petition may plead a claim for unjust enrichment as an alternative to breach of contract.").

Tyson, Avery, and Fuller do not present any apposite authority to the contrary either. For instance, they cite cases — *Lowe v. Hill*, 430 S.W.3d 346 (Mo. App. 2014), and *A & L Underground, Inc. v. Leigh Constr., Inc.*, 162 S.W.3d 509 (Mo. App. 2005), *e.g.* Tyson Motion (Doc. 21) at 10–11 — without noting those cases involved **trials** and lend no support for dismissing Plaintiffs' claims at the pleading stage. Nor do they disclose they relied on these same cases in motions that were denied by Judge Underwood in *Hinkle*. *See* Doc. 36-7 (Motion to Remand **Ex. G**) at 15 & n.5.[9] Moreover, they cite cases that support Plaintiffs and compel denying their Motion, especially as to promissory estoppel. They cite *Chesus v. Watts*, 967 S.W.2d 97 (Mo. App. 1998), *e.g.* Tyson Motion (Doc. 21) at 14, but they fail to note *Chesus* involved claims for both breach of contract and promissory estoppel that were litigated **through a bench trial**. And the Court of Appeals there concluded "the facts of the present case warrant" applying promissory estoppel. 967 S.W.2d at 106–07.[10] Plaintiffs' unjust enrichment and promissory estoppel claims are properly pleaded under Missouri law, which does not support dismissing them at the pleading stage.

Recycling another argument rejected in *Hinkle*, Tyson, Avery, and Fuller then argue that "Plaintiffs' unjust enrichment claim fails because the remaining purported benefits were not

---

[9] They now cite an additional case — *Charter Commc'ns Operating, LLC v. SATMAP Inc.*, 569 S.W.3d 493 (Mo. App. 2018), *see* Doc. 21 at 10 — but the unique facts of *Charter* render it easily distinguishable. There, the parties had already litigated a breach of contract claim through judgment and a prior appeal, and Charter filed a second, follow-on lawsuit where it attempted to assert an unjust enrichment claim. That case does not support dismissing Plaintiffs' claims here.

[10] In addition, Defendants elsewhere rely on *Purcell Tire & Rubber Co. v. Padfield, Inc.*, No. 4:22-CV-433-PLC, 2022 WL 2785898 (E.D. Mo. July 15, 2022) — *see* Doc. 21 at 10 (citing *Purcell*) — but they fail to note its holding "permit[ting] Plaintiff to plead alternative claims for breach of contract and unjust enrichment." 2022 WL 2785898, at *5.

conferred on Tyson *by Plaintiffs*."[11] That does not accurately state Missouri law, which numerous courts have recognized takes a "flexible, totality of the circumstances approach" to unjust enrichment claims. *Cromeans v. Morgan Keegan & Co.*, No. 2:12-CV-04269-NKL, 2013 WL 12129609 (W.D. Mo. Nov. 5, 2013). In *Cromeans*, Judge Laughrey stated the "Court's research has not revealed[] any case applying Missouri law that has rejected a claim for unjust enrichment on the basis that the defendant did not receive a benefit directly from the plaintiff." *Id.* at *5.[12]

Properly read, Plaintiffs allege more than sufficient facts to state a viable unjust enrichment claim. Plaintiffs allege in detail how Tyson's, Avery's, and Fuller's wrongful conduct and long-running scheme coerced Plaintiffs into making unnecessary and costly investments that were detrimental to Plaintiffs and highly beneficial to Defendants. Thrusting such capital expenses onto Plaintiffs meant Defendants had "the enjoyment, benefit, and use of capital they did not have to spend to build or maintain" the chicken farms needed to make the Dexter Complex successful and could thereby earn "interest on said capital and [benefit from the] opportunity to invest that capital." Pet. (Doc. 6) ¶ 128(c)(iv); *see also id.* ¶ 128(d).[13]

---

[11] *E.g.* Tyson Motion (Doc. 21) at 11 (emphasis in original); *compare with* Doc. 36-8 (Motion to Remand **Ex. G**) at 15 (Tyson June 2023 *Hinkle* MTD).

[12] *See also Browning v. Anheuser-Busch, LLC*, 539 F. Supp. 3d 965, 976 (W.D. Mo. 2021) ("[T]here does not appear to be any bright line rule regarding how directly the defendant must have received a benefit at the plaintiff's expense."); *Webb v. Dr Pepper Snapple Group, Inc.*, 4:17–00624–CV–RK, 2018 WL 1955422, at *6 (W.D. Mo. Apr. 25, 2018) ("[T]his Court is persuaded that there does not appear to be any bright line rule regarding how directly the defendant must have received a benefit at the plaintiff's expense.") (quotation omitted).

[13] Tyson also claims "Plaintiffs have no right to these purported benefits," and that "warrants dismissal." Doc. 21 at 11. That factual assertion is unfounded, but far worse is that Tyson misleadingly suggests it supports dismissal under Missouri law. The only case it cites applied Kansas law, not Missouri law. *See Chase v. First Fed. Bank of Kansas City*, No. 4:17-CV-0094-DGK, 2018 WL 1278203, at *3 (W.D. Mo. Mar. 12, 2018) ("The parties agree that Kansas law governs this dispute, and the Court concurs.") (internal footnote omitted).

### C.  Plaintiffs properly pleaded their tortious interference claim

Defendants raise five grounds for dismissing Plaintiffs' tortious interference claim, but none has any merit. **First**, Defendants argue Plaintiffs "do not identify what that business expectancy might be" and contend that Plaintiffs may not rely on "speculation, conjecture, or guesswork." Doc. 21 at 7 (quotation omitted). That is nonsense: Plaintiffs directly and clearly allege both that Defendants wrongly interfered with (and eliminated) any chance that Plaintiffs could sell their services to another meat-processing company for twenty-five years *and* that Defendants conspired to impose upon Cal-Maine a contractual requirement that Plaintiffs first agree to a full release of Tyson before doing business with Cal-Maine. *E.g.* Pet. (Doc. 6) ¶¶ 172–182, *id.* ¶¶ 19–59. Plaintiffs provided concrete factual allegations supporting these claims and do not rely on mere speculation.[14]

**Second**, Defendants attack Plaintiffs' allegations that "Defendants interfered in Plaintiffs' ability to contract with Cal-Maine by requiring a release of 'all Tyson companies and employees.'" Doc. 21 at 13 (quoting Pet. ¶ 178). They claim their challenged conduct is simply an "offer to novate Skaggs Bros' contracts to Cal-Maine" and that "[n]ovation is not improper." Doc. 21 at 13–14. Defendants improperly put their own spin on Plaintiffs' detailed factual allegations about the wrongful acts that all Defendants participated in, including the Tyson/Cal-Maine Sale Agreement (which highlights Avery's key role and knowledge) by which Tyson dictated to Cal-Maine the specific terms to offer Plaintiffs — including requiring Cal-Maine to refuse to deal with Plaintiffs *unless* Plaintiffs released their claims against Tyson. Pet. (Doc. 6) ¶¶ 52–59. Nothing compelled Defendants to agree among themselves in their Sale Agreement that a "novation" was the only

---

[14] Plaintiffs' allegations already suffice, but Plaintiffs recently learned more facts they could allege showing Tyson interfered with Plaintiffs' business expectancies by refusing to consider selling to an interested meat-processing competitor. Even if Defendants' arguments were credited, dismissal should not be granted and Plaintiffs should be afforded an opportunity to amend their pleading.

acceptable method for Cal-Maine to deal with Plaintiffs; that strategy was a conscious choice, and it was made intentionally and wrongfully to interfere with Plaintiffs' business expectancies.

In addition, Plaintiffs detailed many other specific wrongful acts, including the illegal "Property Use Agreement," which Tyson continues wrongly to keep secret, as its publication would reveal Tyson broke the law and lied to government officials such as Senator Hawley. *Id.* ¶¶ 9–33. The 25-year duration of that anticompetitive "Prohibited Use Agreement" obviously interferes with and stops business expectancies from arising for Plaintiffs. *Id.* ¶¶ 9–59, 172–182. And Plaintiffs expressly allege that Defendants' actions are illegal and unjustified. *Id.* ¶¶ 57–59. As Judge Underwood found in *Hinkle* regarding similar allegations and theories, Plaintiffs' allegations state plausible tortious interference claims that should proceed. *See* Doc. 36-3.

**Third**, Tyson contends that no tortious interference claim can exist because it misconstrues Plaintiffs' claim as alleging that "Tyson interfered with its own contract with Plaintiffs by offering to novate them to Cal-Maine." Doc. 21 at 14. Wrong: when Tyson shuttered the Dexter Complex and ceased purchasing services from Plaintiffs, the contract was breached and terminated. Through the Tyson/Cal-Maine Sale Agreement, Tyson then demanded and obtained Cal-Maine's agreement that Cal-Maine would refuse to do business with Plaintiffs under a new contract unless that new contract between Plaintiffs and Cal-Maine fully released Tyson. Tyson also wrongly construes inferences in its favor, contending one phrase taken out of context shows "Plaintiffs admit that they rejected Cal-Maine's contract[15] for reasons having nothing to do with Tyson." Doc. 21 at 14 (citing Pet. ¶ 55). That isolated allegation is merely one portion of Plaintiffs' allegations depicting the many reasons why the Tyson-dictated Cal-Maine contract was unacceptable, and Tyson further

---

[15] Tyson's own phrasing ("Cal-Maine's contract") refutes its prior argument, as even Tyson recognizes the contract at issue is a ***new*** contract being offered by Cal-Maine.

ignores that Plaintiffs alleged it was **Tyson** that insisted on the objectionable terms. Pet. ¶¶ 52–59.

**Fourth**, Avery and Fuller raise two related arguments unique to them, but both are wrong as they misstate Missouri law and the Petition's detailed allegations. First, as to the law, they assert that "Missouri law immunizes employees from individual liability" unless they "act out of self-interest or personal gain." Doc. 22 at 16. As noted in Plaintiffs' Motion to Remand, that contention is false and badly misstates Missouri law. *See* Doc. 36 at 18–19.[16] The cited case (*Graham v. Hubbs Mach. & Mfg., Inc.*, 92 F. Supp. 3d 935 (E.D. Mo. 2015)) nowhere speaks of any alleged "immunity" from general tort liability for a corporation's employees. Avery and Fuller invent it.

Nor are Avery and Fuller correct that Plaintiffs "offer no allegations" to support showing the elements of tortious interference against them, including knowledge of specific opportunities and how they committed interference. Doc. 22 at 15. In fact, Plaintiffs include fulsome allegations about Avery's integral role in the Tyson/Cal-Maine Sale Agreement, which mentions him by name and specifies that "Avery has all company knowledge" on the critical issues giving rise to Plaintiffs' claims, including his singular responsibility for monitoring Cal-Maine's compliance with the illegal "Property Use Agreement." *E.g.*, Pet. (Doc. 6) ¶¶ 36–44.

Plaintiffs also allege in detail how both Avery and Fuller demanded that Plaintiffs incur crippling debt to keep doing business with Tyson, even as they knew the Dexter Complex would be shuttered, leaving Plaintiffs unable to repay their loans and making them vulnerable to Defendants' improper scheme to force Plaintiffs to release Tyson as a condition for Plaintiffs to do business with Cal-Maine. *E.g. id.* ¶¶ 105–127. Plaintiffs allege how Defendants' actions relating

---

[16] *E.g.*, *Compare State ex rel. Doe Run Res. Corp. v. Neill*, 128 S.W.3d 502, 505 (Mo. banc 2004) ("An individual is not protected from liability simply because the acts constituting the tort were done in the scope and course, and pertained to, the duties of his employment.") (quotation omitted) *with* Doc. 22 at 15 ("Avery and Fuller cannot be held liable for conduct within the scope of their employment for Tyson"). Defendants' misstatement of Missouri law is unjustifiable.

to the anticompetitive "Property Use Agreement" hampered competition and harmed their future business expectancies. *Id.* ¶¶ 28–59. And, again, Judge Underwood already ruled in *Hinkle* that similar allegations stated viable tortious interference claims under Missouri law.[17]

**Fifth**, Cal-Maine declares Plaintiffs "have not alleged facts to support ***any*** of these elements" of a tortious interference claim while it misconstrues Plaintiffs' claims as suggesting that "Cal-Maine had some kind of an obligation to enter into an agreement on terms acceptable to Plaintiffs." Doc. 19 at 10–11 (emphasis added). That is not Plaintiffs' theory. Rather, Plaintiffs seek to hold Cal-Maine accountable for tortiously interfering with — and wholly ***eliminating*** for 25 years — any chance that Plaintiffs could contract with a meat-processing company at the Dexter Complex, a result which Cal-Maine and Tyson ensured by entering into their anticompetitive Property Use Agreement. Cal-Maine's brief argument does not even attempt to address Plaintiffs' detailed factual allegations and cites virtually no case law, and the Court should reject it.

### D.  Plaintiffs properly pleaded Missouri Antitrust Law claims

Defendants raise four attacks on Plaintiffs' claims asserted under the Missouri Antitrust Law, but none of their arguments has any merit. Before addressing their arguments, Plaintiffs first note that Defendants overlook both a key distinction between the Missouri Antitrust Law and federal antitrust statutes and Missouri cases addressing and condemning similar real property restraints that are on point and doom their motions.

### 1.  Defendants overlook Missouri law that defeats their arguments

Defendants assert that the Missouri Antitrust Law is to be construed "in harmony" with case law interpreting "comparable federal antitrust statutes," *e.g.* Doc. 21 at 15, but they overlook

---

[17] **Ex. C** (7/9/24 Order) (Doc. 36-3); **Ex. K** (Plaintiffs' 6/26/24 Opp'n) at 5–6 (arguing similar allegations stated tortious interference claim) (Doc. 36-11).

that the key statutory provisions of Missouri law on which Plaintiffs rely ***differ from*** and are more expansive than the federal statutes they assert are "comparable." The Petition specifically cites subsection 3 of R.S. Mo. § 416.031, which declares it unlawful to "contract for sale of any ***commodity***" and thereby condition that the "purchaser thereof shall not use or deal in the commodities of a competitor or competitors of the lessor or seller" when such condition "may be to substantially lessen competition." (emphasis added); Pet. ¶ 196. In turn, R.S. Mo. § 416.021(1) defines "commodity" to include "any kind of ***real***, personal, or mixed property." (emphasis added).

In contrast, the federal statutory provision gives a narrower list of "commodities." 15 U.S.C. § 14 (listing "contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale"). And courts have noted that Section 14's terms apply "only to sales of 'commodities,' which do not include the lease of real property." *Russ' Kwik Car Wash, Inc. v. Marathon Petroleum Co.*, 772 F.2d 214, 216 (6th Cir. 1985). Defendants mistakenly rely on federal case law construing narrower statutory terms and overlook important Missouri precedent showing Plaintiffs' claims here are viable.

In *Hall v. Am. Oil Co.*, 504 S.W.2d 313, 316 (Mo. App. 1973), the Court of Appeals ***reversed*** an order dismissing an antitrust claim challenging a lease restriction as anticompetitive. The Court of Appeals noted the "Plaintiffs allege that the effect of the restriction prohibits them from leasing their property to Shell Oil Company; that by American Oil Company's refusal to release the restriction, [plaintiffs] are restrained in the use of their property in violation of the Missouri anti-trust statutes." *Id.* The Court of Appeals concluded those facts were sufficient and that "Plaintiffs should be permitted to develop their anti-trust case." *Id.* at 319. Similar Missouri cases are discussed below and in the related Opposition filed by the plaintiffs in *Hanor & Bixler Farms, LLC v. Tyson Foods, Inc., et al.*, Case No. 24-cv-00188-SEP (E.D. Mo.) and incorporated

here. *See also Reisenbichler v. Marquette Cement Co.*, 108 S.W.2d 343, 345 (Mo. 1937) (stating one may choose "to whom he will sell his goods, but he can not enter into a contract whereby he binds himself not to sell" to certain parties, as that amounts to illegal "concerted action" that the Missouri legislature declared "illegal" because it "inflict[s] an injury upon the public").

### 2.  Plaintiffs sufficiently allege they have antitrust standing

Cal-Maine contends that Plaintiffs "cannot establish antitrust standing" because "the injuries claimed by Plaintiffs are too attenuated to support standing." Doc. 19 at 12–13. Their argument misunderstands both antitrust law and Plaintiffs' claims. Plaintiffs allege they are sellers of chicken farming services to meat-processing companies, and Tyson and Cal-Maine conspired to restrain (indeed, eliminate) the market for such services for 25 years in the Dexter relevant market. *E.g.* Pet. (Doc. 6) ¶¶ 15–50, 195–204. Case law is clear that "market participants" have antitrust standing, and as the Eighth Circuit has explained, a party who buys or sells from "the party engaging in the claimed restraint" has antitrust standing. *S.D. Collectibles, Inc. v. Plough, Inc.*, 952 F.2d 211, 213 (8th Cir. 1991) (describing *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795 (8th Cir. 1987)).[18] Plaintiffs are market participants and have antitrust standing.

Cal-Maine briefly raises two other arguments that also miss the mark and, in fact, support Plaintiffs. Cal-Maine contends that generally "buyers are free to choose from whom they will buy and sellers are free to choose to whom they will sell." Doc. 19 at 14. True, and that is ***exactly the problem*** — but for the anticompetitive restraint (the Property Use Agreement), Cal-Maine would be free to sell the Dexter Complex (which it purchased for a paltry sum) to a meat-processing company. But Defendants conspired to stop such a competitive outcome, a fact Tyson admitted

---

[18] None of the cases cited in Cal-Maine's lengthy footnote are to the contrary, *see* Doc. 19 at 15 & n.3., and each involved clearly distinguishable facts (including several attempted challenges to mergers, claims that are not at issue here).

was its motivation in a court filing. Pet. (Doc. 6) ¶¶ 45–49. Tyson admitted that the purpose of the Property Use Agreement was to "reduce[] the risk that Cal-Maine could profitably engage in arbitrage" by selling the plant it bought on the cheap to a meat-processing company, which would stand to reap considerably greater value from the Dexter Complex than Cal-Maine. *Id.* ¶ 49.

Nor is Cal-Maine correct that Plaintiffs' claims are "moot" because Defendants purported to "rescind" their anticompetitive agreement after Plaintiffs exposed it and after Defendants already gutted the Dexter Complex of its chicken-processing equipment and retro-fitted it to process table eggs. *See* Doc. 19 at 15–16; Pet. (Doc. 6) ¶¶ 45–48. Indeed, Defendants' rescission amounts to an admission of guilt, and Cal-Maine is incorrect to contend that the "Property Use Agreement never posed a threat to competition." Doc. 19 at 16. Tyson's own admission reveals its very real concern that, absent the anticompetitive restraint, Cal-Maine might have profited by selling the Dexter Complex to a meat-processing company. Pet. (Doc. 6) ¶ 49.

### 3. Plaintiffs alleged a plausible antitrust conspiracy

Cal-Maine raises three related arguments in contending Plaintiffs "failed to allege a plausible antitrust conspiracy." Doc. 19 at 16. **First**, it asserts that Plaintiffs do not allege sufficient facts "to support the conclusion that the restrictive covenant in this case would have a substantial adverse effect on competition." *Id.* at 17. Partially quoting *United States v. Addyston Pipe & Steel Co.*, 85 F. 271, 281 (6th Cir. 1898), Cal-Maine contends restrictive covenants like the Property Use Agreement are "'generally upheld as valid,'" *id.*, but Cal-Maine omits key qualifying language and ignores that the facts here ***do not fit*** the hypotheticals discussed in dicta in *Addyston Pipe* (which involved a *per se* illegal bid-rigging conspiracy).[19] Cal-Maine ignores that the *Addyston*

---

[19] The dicta in *Addyston Pipe* referred to examples of ***potentially*** lawful restraints, such as restraints "(1) by the seller of property or business not to compete with the buyer in such a way as to derogate (***Footnote continued***)

*Pipe* court emphasized the defendant's fact-intensive burden of showing the restraint is "reasonably necessary." *Id.* Moreover, Cal-Maine ignores both a long history of courts finding such restrictive covenants are in fact anticompetitive[20] and the detailed factual allegations supporting Plaintiffs' theory that the restraint affecting the unique property at issue here (a slaughterhouse, with attendant demanding infrastructure needs) did have a substantial and adverse effect on competition in the market for chicken farming services. Pet. ¶¶ 45–49, 197–203.

**Second**, the Court should not credit Cal-Maine's fact-based arguments that Plaintiffs "allege the wrong relevant market" and that "[n]othing in the restraint prevents a chicken meat processing company from purchasing other property in or around Dexter, Missouri." Doc. 19 at 17. Plaintiffs allege otherwise, and resolving factual disputes about the relevant market at issue is widely held to be improper on a motion to dismiss. "[M]arket definition is a deeply fact-intensive inquiry," and therefore "courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011) (quotation omitted) (citing cases); *see also Foam Supplies, Inc. v. The Dow Chem. Co.*, No. 4:05 CV 1772 CDP, 2006 WL 2225392, at *6 (E.D. Mo. Aug. 2, 2006) (denying motion to dismiss

---

from the value of the property or business sold" and "(4) by the buyer of property not to use the same in competition with the business retained by the seller." 85 F. at 281. Neither applies here, as the restraint did not bind Tyson (the seller, so (1) does not apply), and Tyson had exited the Dexter relevant market and had no "business retained," so (4) does not apply. Moreover, antitrust scholars such as Robert Bork have suggested that example (4), "the covenant by the seller of a business not to compete with it subsequently," depicts an "incorrect application[]" of antitrust principles. Robert H. Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division*, 74 Yale L.J. 775, 831 (1965).

[20] *E.g.*, *Shawnee Compress Co. v. Anderson*, 209 U.S. 423, 433 (1908) (affirming finding in favor of plaintiffs challenging restrictive covenant in a lease containing agreement "not to 'directly or indirectly engage in the compressing of cotton within 50 miles of any plant operated by the tenan[t],'" which the Supreme Court held was an illegal "restraint of trade"); *Darius Cole Transp. Co. v. White Star Line*, 186 F. 63, 67-68 (6th Cir. 1911) (condemning covenant not to compete attending business sale because purpose of agreement was to give buyer monopoly power in particular market).

challenging proposed relevant market because that is a "fact-sensitive determination that will be resolved at a later time").

**Third**, Cal-Maine relies on case law that requires denying its motion. *See* Doc. 19 at 17–18. Cal-Maine cites *Dunafon v. Delaware McDonald's Corp.*, 691 F. Supp. 1232 (W.D. Mo. 1988), to argue that a lease restriction affecting a restaurant owner was upheld because it "did not pose [a] threat to competition," but Cal-Maine neglects to mention that case was not dismissed on the pleadings but instead involved a ***multi-day bench trial***, expert analysis and testimony, and detailed "post-trial briefs." 691 F. Supp. at 1235. It should be obvious that a slaughterhouse is a considerably more unique and difficult-to-develop property than a fast-food restaurant (at issue in *Dunafon*), and Plaintiffs' detailed allegations on these points and the potential harm to competition more than merit proceeding into discovery on their claims, just as occurred in *Dunafon*.

Cal-Maine's efforts to avoid Missouri law, under which it admits "real property restrictive covenants are disfavored," fares no better. Doc. 19 at 18 (citing *Dean v. Monteil*, 239 S.W.2d 337 (Mo. 1951); *Shepherd v. Spurgeon*, 291 S.W.2d 162 (Mo. 1956); *Kerrick v. Schoenberg*, 328 S.W.2d 595 (Mo. 1959)). Cal-Maine misstates Plaintiffs' allegations as somehow conceding the Prohibited Use Agreement here is "for a limited duration and narrowly tailored" and such "difference in facts is decisive." Doc. 19 at 18. That ignores the condemned restriction in *Dean* was "to continue for 20 years" (and could continue longer if conditions were met) 239 S.W.2d at 339, whereas the restraint here had a 25-year duration. It also ignores the court's conclusion in *Dean* that "uphold[ing] the restrictions now would serve the sole purpose of restricting competition in business" and therefore they were "void as against public policy." *Id.* at 340. And Cal-Maine overlooks the controlling Missouri case law discussed above, and cases such as *Hall*, *Reisenbichler*, and *Dean* compel denying Cal-Maine's motion.

21

#### 4. **Plaintiffs properly allege antitrust claims against Tyson**

Tyson's arguments against Plaintiffs' Missouri Antitrust Law claim likewise ignore the controlling Missouri case law discussed above and instead invent non-existent "holdings" from inapposite and easily distinguished federal cases. Tyson's four arguments each fail.

**First**, Tyson mischaracterizes Plaintiffs' allegations as merely challenging Tyson's plant closure, which it contends did not cause any "antitrust injury." Doc. 21 at 15–16. Not so; had Tyson merely shuttered the Dexter Complex and retained its ownership, Plaintiffs would not assert any antitrust claim. But that is not what happened. Tyson decided it wanted to profit from the closure and sell the plant, and it wrongfully insisted that the sale include a restraint on both how the buyer itself could use the Dexter Complex and also on how any later buyer or lessor could use it. That undisputed contractual restraint is what violates the Missouri Antitrust Law and caused Plaintiffs' injuries, and Tyson's arguments ignore this clear distinction and are easily rejected.[21]

**Second** and relatedly, Tyson's argument that it was "not obligated" to sell to a competitor and was free to make a "unilateral decision to sell to Cal-Maine" also mischaracterizes the central point of Plaintiffs' claims. Doc. 21 at 17–18. Tyson relies on irrelevant federal cases addressing totally different challenges to purely unilateral conduct and refusals to deal with "business rivals." *Id.*[22] Here, Tyson and another party (Cal-Maine) took concerted action and ***agreed in writing*** to a restraint affecting the Dexter Complex and causing a substantial lessening of competition.

**Third**, like Cal-Maine, Tyson relies heavily on a 120-plus-year-old case decided by then-

---

[21] Relatedly, Tyson is wrong to characterize Plaintiffs' allegations as "conclusory" on the topic of whether other potential meat-processing buyers were prevented from purchasing the plant, Doc. 21 at 17; these allegations are detailed, and, if necessary, Plaintiffs can assert additional facts.

[22] Tyson cites *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985), and *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398 (2004), but those cases dealt with single-defendant monopolization claims under Section 2 of the Sherman Act, 15 U.S.C. § 2, and are irrelevant to challenging an anticompetitive ***agreement*** among multiple defendants here.

Judge Taft, but Tyson badly mischaracterizes *Addyston Pipe*, which it claims "endorsed an ancillary deed restriction like the Property Use Agreement" as then "Judge Taft **held** that" such a restriction was legal and "'certainly reasonable'" Doc. 21 at 18 (emphasis added). That is false. *Addyston Pipe* condemned a bid-rigging and market-allocation conspiracy, and Judge Taft's comments about hypothetical restrictive covenants are pure dicta. 85 F. at 279–281. No actual restrictive covenant was at issue in the case; Tyson can only hallucinate such a "holding," and its non-hallucinated arguments about *Addyston Pipe* are wrong as argued above.

**Fourth**, Tyson briefly relies on *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, 797 F.3d 538 (8th Cir. 2015), Doc. 21 at 19, in contending that "'meritless'" and "'anemic'" antitrust claims are rightly dismissed, but that case supports Plaintiffs. In *Insulate SB*, the plaintiffs purported to challenge an alleged "exclusive-dealing contract," but all they could point to was a letter sent by one defendant without any factual allegations showing any other defendant agreed to the letter's terms, with the Eighth Circuit holding that "the letter alone cannot constitute a written exclusive-dealing contract" that might violate the antitrust laws. 797 F.3d at 544. No such shortcoming exists here: there is no dispute that Tyson and Cal-Maine reached a written agreement that restrained how Cal-Maine (and future parties) could use the Dexter Complex. The anticompetitive (or any purported pro-competitive) effects of that undisputed agreement must be fleshed out in discovery.

### 5. Plaintiffs sufficiently allege Avery and Fuller's participation

Avery and Fuller join in Tyson's incorrect and baseless arguments against Plaintiffs' antitrust claims, *see* Doc. 22 at 16, and the Court should likewise reject their motion. They also concede that corporate officials can face antitrust liability "if they participate in" or "authorize" actions that violate the antitrust laws. Doc. 22 at 17 (quoting *Bergjans Farm Dairy Co. v. Sanitary Milk Producers*, 241 F. Supp. 476 (E.D. Mo. 1965)). The *Bergjans* case supports Plaintiffs, as

argued in Plaintiffs' Motion to Remand. Doc. 36 at 21–22. To conserve space, Plaintiffs here incorporate those arguments as well as the arguments made in the similar and contemporaneously filed Opposition Memorandum in *Hanor & Bixler*, Case No. 24-cv-00188-SEP (E.D. Mo.).

Avery and Fuller's remaining arguments raise a host of disputed factual questions about both the meaning and practical implementation of contractual terms, *e.g.* Doc. 22 at 18–20. Those fact-bound contentions should be rejected at this stage or, at most, be deemed a reason to permit Plaintiffs to amend to allege additional facts showing Avery and Fuller's direct participation in and authorization of the anticompetitive conduct at issue.

### E.  Plaintiffs properly pleaded breach of contract claims against Tyson

Tyson contends that Plaintiffs do not state a valid breach of contract claim because allegedly "Tyson is still paying Plaintiffs." Doc. 21 at 19. This "fact" is nowhere to be found in Plaintiff's Petition, and that is because it is not true. Tyson is not entitled to fabricate "facts" of its choosing and then argue dismissal is proper. Plaintiffs properly allege every element of a breach of contract claim, and there is nothing "conclusory" about their allegations that "Tyson 'materially breached the contracts.'" *Id.* (quoting Pet. ¶ 208). The Petition has abundant details about Tyson's shuttering the Dexter Complex and no longer using Plaintiffs' services.

The Court also should reject Tyson's argument that Plaintiffs "do not allege when and how Tyson breached those contracts and … what provision(s) of the contracts Tyson allegedly breached." Doc. 21 at 19.[23] Plaintiffs' allegations plainly identify the breach of contract elements: Tyson agreed to purchase fertile eggs from Plaintiffs then abruptly breached their agreements and stopped doing so when they shuttered the Dexter Complex.[24] *E.g.* Pet. ¶¶ 1–59, 104–128. Likewise,

---

[23] Tyson also asserted, and lost, a similar argument in *Hinkle*, and its third try should fare no better.

[24] This case bears no resemblance to *AIDS Healthcare Foundation v. Express Scripts, Inc.*, where (**Footnote continued**)

it is hollow for Tyson to complain that Plaintiffs "do not articulate in any way their alleged damages as a result of [Tyson's] breach." Doc. 21 at 20 (quotation omitted). In fact, Plaintiffs dedicated over eight pages describing the harm caused by Tyson, allegations that Tyson simply ignores. *See* Pet. ¶¶ 104–128. Plaintiffs' extensive, 210 paragraphs of allegations about the parties' dealings are incorporated into the breach of contract count, *see* Pet. ¶ 205, and those preceding 204 paragraphs describe in detail how Tyson wrongfully broke its promises and improperly and prematurely terminated its agreements with Plaintiffs. Such allegations more than suffice under Missouri law.[25]

### F.  Plaintiffs' civil conspiracy claim is proper

The only ground advanced for dismissing Plaintiffs' civil conspiracy claim is that Plaintiffs "failed to state any claims . . . for an underlying wrongful act" given that civil conspiracy is not itself an "independent tort." *E.g.* Doc. 21 at 20; Doc. 19 at 11–12. But Plaintiffs state valid underlying tort claims, as argued above and as twice found by Judge Underwood in *Hinkle*. Plaintiffs' civil conspiracy claims should proceed.

### V.    <u>Conclusion</u>

For the reasons stated above and in Plaintiffs' Motion to Remand, this case must be remanded, and the Motions to Dismiss denied, because Plaintiffs state plausible claims for relief.

---

plaintiffs intended to "wait until discovery to identify what promises the defendant has breached." 658 F. Supp. 3d 693, 703 (E.D. Mo. 2023) (quotation omitted).

[25] In addition, the Missouri Supreme Court recently held that, as a matter of Missouri law, it is "premature to answer [a contract interpretation] question definitively on a motion to dismiss" because whether the plaintiff's "construction is actually correct is a matter for summary judgment, judgment on the pleadings, or trial — when the court decides the ***merits*** of adequately pleaded cases." *Bell v. Shelter Gen. Ins. Co.*, No. SC 100461, 2024 WL 4828110, at *4 (Mo. Nov. 19, 2024) (emphasis in original).

Dated: December 11, 2024

Respectfully submitted by:

BOULWARE LAW LLC

/s/ Jeremy M. Suhr

Brandon J.B. Boulware          #54150MO
Jeremy M. Suhr                 #60075MO
1600 Genessee, Suite 956A
Kansas City, MO 64102
Tele:      (816) 492-2826
Fax:       (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

THE OLIVER FIRM, L.C.
Russell D. Oliver              #59394MO
1402 N. Outer Rd, Ste. A
Dexter, MO 63841
Tele:      (573) 614-7959
russ@oliver-lawfirm.com

*Attorneys for the Skaggs Parties*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of December 2024, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to counsel of record for this case.

/s/ Jeremy M. Suhr
*Attorney for the Skaggs Parties*

26